**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MELISSA M. BURNS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 10-522** |
| | ) | **Judge Nora Barry Fischer** |
| **GARY D. ALEXANDER, Acting** | ) | |
| **Secretary of the Commonwealth of** | ) | |
| **Pennsylvania Department of Public** | ) | |
| **Welfare, in his official capacity, and** | ) | |
| **RAYMOND S. HART,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

### I.    Introduction

This action involves a constitutional challenge to certain provisions of Pennsylvania's

Child Protective Services Law ("CPSL") [23 PA. CONS. STAT. § 6301 *et seq.*].  Pending before

the Court is a motion to dismiss filed by the Defendants pursuant to Federal Rule of Civil

Procedure 12(b), subsections (1)[1] and (6).[2]  Docket No. 20.  For the reasons that follow, the

motion will be granted in part and denied in part.

### II.    Background[3]

Plaintiff Melissa M. Burns ("Burns") is an adult individual residing in North Fayette

Township, Pennsylvania.  Docket No. 17 at ¶ 1.  She is the owner and operator of the Helping

Hands Childcare and Learning Center ("Helping Hands"), which is a child-care facility located

---

[1] Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move for the dismissal of a complaint on the ground that a federal court lacks subject-matter jurisdiction to adjudicate the case at issue.  FED. R. CIV. P. 12(b)(1).
[2] Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move for the dismissal of a complaint on the ground that it fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).
[3] Given the procedural posture of this case, the allegations contained in the second amended complaint are assumed to be true.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

in Imperial, Pennsylvania.  *Id.* at ¶ 2.  Helping Hands earned a three-star rating from Pennsylvania's Keystone STARS program prior to the events in question.[4]  *Id.*  To achieve such a rating, a facility must satisfy criteria exceeding the normal licensing requirements for all such facilities operating in Pennsylvania.  *Id.* at ¶ 42.  As a three-star facility, Helping Hands received grants to sustain additional educational programs.  *Id.*

Defendant Gary D. Alexander (the "Secretary") is Pennsylvania's Acting Secretary of Public Welfare.[5]  *Id.* at ¶ 3.  At all times relevant to this case, Defendant Raymond S. Hart ("Hart") was employed by Pennsylvania's Department of Public Welfare ("DPW") as a Regional Program Representative.  *Id.* at ¶ 4.  He worked out of the Western Regional Children, Youth and Families Office, which is located in Pittsburgh, Pennsylvania.  *Id.*

The CPSL requires certain individuals to report known cases of child abuse to the DPW or the appropriate county agencies.[6]  23 PA. CONS. STAT. § 6311(a)-(b).  In addition to those statutorily required to furnish such reports to the appropriate authorities, "any person may make

---

[4] Keystone STARS is an initiative launched by Pennsylvania's Department of Public Welfare ("DPW") to facilitate early learning programs for children.  Keystone STARS Information for Parents, http://www.dpw.state.pa.us/forchildren/childcareearlylearning/keystonestarsinformationforparents/index.htm (as visited on February 9, 2011).  The acronym "STAR," which typically appears in the plural form, stands for Standards, Training/Professional Development, Assistance and Resources.  *Id.*  An early learning program can earn a one-star, two-star, three-star or four-star rating based on the quality of its staff education, learning environment, leadership management and family/community partnerships.  *Id.*

[5] When Burns commenced this action, Harriet Dichter ("Dichter") was the Acting Secretary of Public Welfare.  For this reason, Dichter was originally named as an official-capacity defendant in this action.  Docket No. 17 at ¶ 3.  Dichter resigned on September 15, 2010, and was replaced by Michael Nardone ("Nardone").  Pennsylvania Department of Public Welfare Secretary Harriet Dichter to resign, http://www.pennlive.com/midstate/index.ssf/2010/09/pennsylvania_department_of_pub.html (as visited on February 7, 2011).  Gary D. Alexander ("Alexander") became the Acting Secretary of Public Welfare on January 18, 2011.  Secretary of Public Welfare, http://www.dpw.state.pa.us/dpworganization/secretaryofpublicwelfare/index.htm (as visited on February 7, 2011).  Alexander automatically became the official-capacity defendant in this action when he assumed his current position.  FED. R. CIV. P. 25(d)(providing that "[t]he officer's successor is automatically substituted as a party" under these circumstances); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)(explaining that "when officials sued in [their official capacities] in federal court die or leave office, their successors automatically assume their roles in the litigation").

[6] Although a county agency is ordinarily "the sole civil agency responsible for receiving and investigating all reports of child abuse" made pursuant to the CPSL, the DPW assumes the role of the county agency "[w]hen the suspected abuse has been committed by the county agency or any of its agents or employees."  23 PA. CONS. STAT. § 6362(a)-(b).

2

such a report if that person has reasonable cause to suspect that a child is an abused child." 23 PA. CONS. STAT. § 6312. A report submitted by an individual having a statutory duty of disclosure "shall be made immediately by telephone and in writing within 48 hours after the oral report."[7] 23 PA. CONS. STAT. § 6313(a). Pursuant to the terms of the CPSL, the DPW maintains both a "Statewide central register" consisting of "founded and indicated reports" of child abuse and "a single Statewide toll-free telephone number that all persons, whether mandated by law or not, may use to report cases of suspected child abuse." 23 PA. CONS. STAT. §§ 6331(2), 6332(a).

After receiving a "report of suspected child abuse," a county agency must "commence an appropriate investigation" and meet with the child alleged to have been abused within 24 hours. 23 PA. CONS. STAT. § 6368(a). Before interviewing the alleged perpetrator of the abuse, the county agency is required to orally notify the accused individual of both the existence of the report and the rights that he or she enjoys under the CPSL. 23 PA. CONS. STAT. § 6368(a). After providing such oral notice, the county agency has 72 hours to supply the alleged perpetrator with a written notice containing the same information. *Id.*

Once a "report of suspected child abuse" has been received, a county agency must determine within 60 days whether to classify the report as a "founded report," an "indicated report," or an "unfounded report."[8] 23 PA. CONS. STAT. § 6368(c). A report constitutes a "founded report" where there has been a "judicial adjudication based on a finding that a child

---

[7] Written reports of suspected child abuse must include: (1) the name and address of the child alleged to have been abused, along with the names of the child's parents (or other persons responsible for the child's care); (2) the location of the suspected child abuse; (3) the ages and sexes of the subjects of the report; (4) the nature and extent of the suspected child abuse, including any evidence of prior abuse to the child or to siblings of the child; (5) the name of the person allegedly responsible for causing the abuse, along with his or her relationship to the child, and any evidence of prior abuse allegedly perpetrated by that individual; (6) the composition of the family or families involved; (7) the source of the report; (8) the identity of the person making the report, along with information as to how he or she can be reached; (9) the actions taken by the reporting source in response to the abuse; and (10) any other information required under regulations promulgated by the DPW. 23 PA. CONS. STAT. § 6313(c).
[8] Where a determination is not made within 30 days, the relevant county agency is required to document "the particular reasons for the delay." 23 PA. CONS. STAT. § 6368(c).

who is a subject of the report has been abused, including the entry of a plea of guilty or nolo contendere or a finding of guilt to a criminal charge involving the same factual circumstances involved in the allegation of child abuse." 23 PA. CONS. STAT. § 6303(a). A report constitutes an "indicated report" if an investigation by the DPW or a county agency reveals that "substantial evidence of the alleged abuse exists" based on "[a]vailable medical evidence," "[t]he child protective service investigation," or "[a]n admission of the acts of abuse by the perpetrator." *Id.* "Substantial evidence" is defined as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." *Id.* Where a report of suspected child abuse is neither a "founded report" nor an "indicated report," it is automatically classified as an "unfounded report." *Id.* The failure of a county agency to make a finding within the statutory 60-day period results in a determination that the relevant report is "unfounded." 23 PA. CONS. STAT. § 6337(b).

When it receives "a complaint of suspected child abuse," the DPW is required to "maintain a record of the complaint . . . in the pending complaint file." 23 PA. CONS. STAT. § 6334(c). The CPSL provides that "[w]hen a report of suspected child abuse . . . is determined by the appropriate county agency to be a founded report or an indicated report, the information concerning that report . . . shall be expunged immediately from the pending complaint file, and an appropriate entry shall be made in the Statewide central register." 23 PA. CONS. STAT. § 6338(a). Notice of such a determination must be given to the perpetrator of the abuse. *Id.* This notice must inform the individual that his or her "ability to obtain employment in a child-care facility or program . . . may be adversely affected by [the] entry of the report in the Statewide central register." *Id.*

"Any person named as a perpetrator . . . in an indicated report of child abuse may, within 45 days of being notified of the status of the report," request that the Secretary "amend or expunge" the report on the ground that it is "inaccurate." 23 PA. CONS. STAT. § 6341(a)(2). If the request is granted, the county agency may file an administrative appeal within 45 days. 23 PA. CONS. STAT. § 6341(b). If the Secretary either denies the request or fails to act on it within 30 days, the alleged perpetrator has 45 days from the date of the letter denying the request to demand a hearing. 23 PA. CONS. STAT. § 6341(c). At such a hearing, the "appropriate county agency" bears the burden of proving that "substantial evidence of the abuse exists." 23 PA. CONS. STAT. §§ 6303(a), 6341(c). In any case in which a report of child abuse is initially found to be an "indicated report," the statutorily-required notice of the determination must inform the individual of his or her right to appeal the determination "within 45 days after being notified of the status of the report," and of his or her "right to a hearing if the [appeal] is denied." 23 PA. CONS. STAT. § 6338(a).

An administrator of a "child-care service" must require each prospective employee to submit a "certification" from the DPW revealing whether he or she has been "named in the central register as the perpetrator of a founded report of child abuse," or as the perpetrator of an "indicated report of child abuse," within the preceding year. 23 PA. CONS. STAT. § 6344(b)(2). An applicant who is "named in the central register as the perpetrator of a founded report of child abuse committed within the five-year period immediately preceding verification" may not be hired. 23 PA. CONS. STAT. § 6344(c)(1). As the owner and operator of Helping Hands, Burns was required to comply with this statutory mandate. Docket No. 17 at ¶ 44; 23 PA. CONS. STAT. § 6344(e), (f).

In May 2008, Helping Hands began to provide daily child-care and educational services to a three-year-old girl named "DM" and her five-year-old sister.[9]  *Id.* at ¶ 46.  Both of the girls had been placed in therapeutic foster care and were under the supervision of a foster family.  *Id.* at ¶ 47.  DM was known to be suffering from socialization problems and elevated levels of lead in her blood.  *Id.* at ¶¶ 48-49.

At approximately 9:15 A.M. on November 17, 2008, DM and her sister were transported to Helping Hands by their foster father.  *Id.* at ¶ 50.  Fifteen minutes later, DM began to complain of pain in her arm.  *Id.* at ¶ 51.  These complaints persisted for over an hour.  *Id.*  Burns unsuccessfully tried to contact DM's foster father at 10:30 A.M.  *Id.*  Shortly thereafter, DM started to engage in aggressive behavior.  *Id.* at ¶ 52.  She began to throw toys and fight with other children.  *Id.*  Burns responded by escorting DM into the facility's kitchen and lifting her into a high chair.  *Id.* at ¶ 55.  A 30-foot wall separated the kitchen from the area in which DM had been playing, making it impossible for the other children to view Burns' interactions with DM.  *Id.* at ¶ 54.  DM did not cry or otherwise indicate that she was in distress.  *Id.* at ¶ 55.  She was not within the view of her sister, who was roughly 40 to 50 feet away.  *Id.* at ¶ 57.  DM was subsequently taken out of the high chair and allowed to resume her interactions with the other children.  *Id.* at ¶ 58.  At 11:30 A.M., DM's foster father telephoned Helping Hands personnel and informed them that he would check her arm when he arrived to take her sister to a kindergarten class.  *Id.* at ¶ 59.  He arrived at Helping Hands 45 minutes later, at which point DM began to cry because of her inability to put on a coat.  *Id.* at ¶ 60.  DM's foster father became agitated and tried to force her arm into the sleeve of the coat.  *Id.* at ¶ 61.  DM continued to cry.  *Id.*  Burns suggested that DM be permitted to stay at the facility longer in order to take a

---

[9] Federal Rule of Civil Procedure 5.2(a)(3) provides that references to "the name of an individual known to be a minor" may normally include only "the minor's initials."  FED. R. CIV. P. 5.2(a)(3).  In accordance with this mandate, the second amended complaint refers to the three-year-old girl as "DM."  Docket No. 17 at ¶ 46.

nap. *Id.* DM's foster father agreed to this arrangement and left the facility with DM's sister. *Id.* He later returned to pick DM up. *Id.* at ¶ 62. DM never went back to Helping Hands. *Id.*

On November 19, 2008, Hart sent Burns a letter informing her that she had been named as an alleged perpetrator of child abuse in connection with her treatment of DM. *Id.* at ¶ 63. The letter explained the three possible findings that could be made with respect to the report. *Id.* at ¶ 66. Although Burns was informed of the negative consequences that would befall her if the report were deemed to be a "founded report," she was never warned of the negative implications of a determination that the report was an "indicated report." *Id.* at ¶ 67. When Burns inquired as to whether she should be concerned about the investigation, she was told that it was "routine," and that she had nothing to worry about. *Id.* at ¶ 70.

Hart interviewed DM and her sister eight days later. *Id.* at ¶ 71. He subsequently went to Helping Hands, where he interviewed Burns and three members of her staff. *Id.* at ¶ 78. Each interview lasted between 10 and 15 minutes. *Id.* The interviews were conducted in an office located approximately three feet inside of the entrance to Helping Hands. *Id.* at ¶ 77. Hart was told that DM had complained of pain prior to being escorted into the kitchen and lifted into the high chair. *Id.* at ¶ 79. The three staff members explained that they had not seen Burns lift DM into the high chair. *Id.* The placement of DM into the high chair, however, had apparently occurred in close proximity to one of the staff members, who indicated that DM had exhibited no signs of pain or distress while being lifted and transported by Burns. *Id.* After completing the interviews, Hart left Helping Hands without examining the area in which the abuse was alleged to have occurred. *Id.* at ¶ 80. He neither inspected the layout of the kitchen nor observed the place where DM's sister had been at the time of the incident. *Id.*

After concluding his investigation, Hart determined that the report of abuse that had been made in connection with Burn's treatment of DM was an "indicated report." *Id.* at ¶ 82. Hart notified Burns of this determination on December 16, 2008. *Id.* at ¶ 83. Burns was informed that she had been listed as an "indicated" abuser in the central register.[10] *Id.* She was made aware of this listing only after her name had already been added to the central register. *Id.* at ¶ 84. As a result of her status as an "indicated" child abuser, Burns was instructed to remove herself from Helping Hands and inform the parents of her students in writing about the situation. *Id.* at ¶ 85. Shortly thereafter, state authorities informed Burns that her operating license would not be renewed, and that she was required to display a notice to that effect at the entrance of Helping Hands. *Id.* at ¶ 86. Helping Hands was suspended from the Keystone STARS program and stripped of its three-star rating. *Id.* at ¶ 87. As a result of the suspension, Helping Hands lost over $30,000.00 in grant money and tuition support. *Id.* Notice of the suspension was published on Keystone STARS' publicly-accessible website. *Id.*

Burns requested a copy of Hart's investigative report. *Id.* at ¶ 89. She was provided only with a copy of the "CY-48" form that Hart had prepared in connection with his determination. *Id.* The form contained language indicating that Hart had made his determination based on "credible and convincing" information provided by DM and her sister, and on a medical report setting forth the specific nature of DM's injury. *Id.* at ¶ 90. Although the injury was described

---

[10] The specific information that must be recorded in the central register in connection with a finding that child abuse has occurred is described at 23 PA. CONS. STAT. § 6336(a). Such information includes: (1) the names, Social Security numbers, ages and sexes of the subjects of the report; (2) the date or dates, and the nature and extent, of the alleged instances of suspected child abuse; (3) the home addresses of the subjects of the report; (4) the county in which the suspected abuse occurred; (5) the composition of the family or families involved; (6) the names of other persons named in the report, along with a description of their relationship with the abused child; (7) factors contributing to the abuse; (8) the source of the report; (9) services planned or provided in response to the report; (10) a specification as to whether the report has been deemed to be an "indicated report" or a "founded report"; (11) information obtained by the DPW in relation to a perpetrator's request to release, amend or expunge information retained by the DPW or a county agency; (12) the progress of any legal proceedings brought on the basis of the report of suspected child abuse; and (13) a statement as to whether a criminal investigation has been undertaken, along with information concerning the results of any such investigation and any resulting criminal prosecution. *Id.* No other information may be retained in the central register. *Id.*

on the form as an "elbow dislocation," Burns alleges that it was actually a "radial head subluxation," which is commonly referred to as "nursemaid's elbow." *Id.* at ¶ 91.

After learning of her status as an "indicated" child abuser, Burns requested an expunction hearing with the DPW.[11] *Id.* at ¶ 93. Although the hearing request was submitted to the DPW's Division of Operations and Quality Control on January 7, 2009, it was not forwarded to the Bureau of Hearings and Appeals until January 30, 2009. *Id.* at ¶ 94. On February 19, 2009, a hearing was scheduled for April 8, 2009. *Id.* Six days later, the hearing was rescheduled for April 30, 2009. *Id.*

Burns was provided with a "Unified Pre-Hearing Filing Instruction Sheet," which outlined her right to subpoena witnesses and documentary evidence by completing a "Unified Pre-Expunction Hearing Document." *Id.* at ¶ 95. The instruction sheet indicated that all subpoena requests needed to be submitted to the administrative law judge ("ALJ") assigned to the case no later than 15 days before the hearing. *Id.* at ¶ 96. In accordance with the instructions, Burns submitted her subpoena requests to the ALJ in a timely manner. *Id.* at ¶ 95.

The CPSL contains provisions limiting the disclosure of information obtained by the DPW and county agencies during the course of investigations. Section 6339 of the CPSL provides:

> **§ 6339. Confidentiality of reports**
> Except as otherwise provided in this subchapter, reports made pursuant to this chapter, including, but not limited to, report summaries of child abuse and written reports made pursuant to section 6313(b) and (c) (relating to reporting procedure) as well as any other information obtained, reports written or photographs or X-rays taken concerning alleged instances of child abuse in the possession of the department or a county agency shall be confidential.

---

[11] It is not clear whether Burns asked the Secretary to expunge the report on the ground of "inaccuracy" before requesting a hearing. 23 PA. CONS. STAT. § 6341(a)(2).

23 PA. CONS. STAT. § 6339. Section 6340(a)(5) permits reports specified in § 6339 to be made available to "[a] court of competent jurisdiction . . . pursuant to [a] court order or subpoena in a criminal matter involving a charge of child abuse . . . ." 23 PA. CONS. STAT. § 6340(a)(5). Section 6340(b) provides that "a subject of a report" may, upon written request, receive a copy of "all information, except that prohibited from being disclosed by subsection (c), contained in the Statewide central register or in any report filed pursuant to [§] 6313 . . . ." 23 PA. CONS. STAT. § 6340(b). An "alleged or actual perpetrator" of child abuse named in a report made to the DPW or a county agency qualifies as "a subject of a report" within the meaning of this statute. 23 PA. CONS. STAT. § 6303(a). Subsections (b) and (c) of § 6313 govern the submission and receipt of reports of suspected child abuse supplied by outside individuals to county agencies. 23 PA. CONS. STAT. § 6313(b)-(c). The specific information contained in the central register with respect to a particular report is governed by § 6336(a), which enumerates 13 specific types of information and provides that "[n]o information other than that permitted [thereunder] shall be retained in the Statewide central register." 23 PA. CONS. STAT. § 6336(a).

In *Dauphin County Social Services for Children & Youth v. Department of Public Welfare*, 855 A.2d 159, 164-165 (Pa.Commw.Ct. 2004), the Pennsylvania Commonwealth Court construed § 6339 to prohibit the disclosure of information to an alleged perpetrator of child abuse obtained during the course of an investigation but not recorded in the central register or contained in the initial report of suspected child abuse. The language of § 6340(b) permits only the disclosure of information recorded in the central register or contained in an initial report submitted pursuant to § 6313. 23 PA. CONS. STAT. § 6340(b). The Commonwealth Court reasoned that the remaining information discovered during the course of the investigation had to be kept "confidential" within the meaning of § 6339. *Dauphin County*, 855 A.2d at 164-165.

Thus, the individual seeking additional information (*i.e.*, an alleged perpetrator of sexual abuse) was not permitted to discover such information in connection with his appeal to the DPW. *Id.* The Commonwealth Court further declared that since the administrative appeal had not arisen within the context of a "criminal matter," the information was not subject to disclosure under § 6340(a)(5). *Id.* at 165.

Although the ALJ granted all subpoena requests which had been made by the DPW, she declined to render a decision concerning Burns' requests. Docket No. 17 at ¶ 97. The ALJ telephoned Burns' counsel and stated that her discretion to grant or deny the subpoena requests was limited by the Commonwealth Court's decision in *Dauphin County*. *Id.* at ¶ 97(a). Burns' counsel responded by saying that *Dauphin County* could not control the disposition of the subpoena requests because Burns had a *constitutional* right to access the desired information. *Id.* at ¶ 97(b). The ALJ indicated that she would rule on Burns' requests before the passage of the discovery cut-off date, but she failed to follow through on that promise. *Id.* at ¶ 97(c). Fifteen days before the scheduled hearing, Burns' subpoena requests were still pending, leaving her without an effective means to defend herself against the allegations which had been lodged against her.[12] *Id.* at ¶¶ 98-99.

On April 20, 2009, just 10 days before the scheduled hearing, the DPW notified both Burns and the ALJ that it would not be presenting a case or making an appearance at the hearing. *Id.* at ¶ 100. The ALJ responded by directing the DPW to remove Burns' name from the central register. *Id.* at ¶ 101. The listing of Helping Hands as a suspended center on Keystone STARS'

---

[12] The Defendants suggest that the Commonwealth Court's subsequent decision in *Northumberland County Children & Youth Services v. Department of Public Welfare*, 2 A.3d 794 (Pa.Commw.Ct. 2010), would permit an accused individual to have access to information of the kind sought by Burns. Docket No. 21 at 5-6, n. 2. That decision, however, did not overrule *Dauphin County Social Services for Children & Youth v. Department of Public Welfare*, 855 A.2d 159 (Pa.Commw.Ct. 2004). *Northumberland County*, 2 A.3d at 801 (relying on *Dauphin County* for the proposition that the accused individual was "not entitled to receive any other information in the county agency's investigatory file").

website was not corrected until September 2009, at which point the prime enrollment season for child-care services had already ended. *Id.* at ¶ 102. Although Keystone STARS reinstated Helping Hands, Burns was informed that she would not be able to recover the $30,000.00 in grant money that she had lost. *Id.* at ¶ 103.

Burns commenced this action against the Secretary and Hart on April 24, 2010, alleging violations of the Fourteenth Amendment to the United States Constitution. Docket No. 1. An amended complaint was filed three days later. Docket No. 3. The Defendants filed a motion to dismiss on June 25, 2010, challenging the Court's subject-matter jurisdiction to adjudicate the claims against the Secretary and contending that Hart was entitled to qualified immunity. Docket Nos. 8 & 9. Burns responded by filing a brief in opposition to the motion. Docket No. 14. The parties were afforded the opportunity to advance their respective positions during the course of an oral argument session conducted on September 28, 2010. Docket No. 15. At that time, Burns was given 30 days to amend her complaint. *Id.* On October 28, 2010, Burns filed her second amended complaint in accordance with the Court's instructions, thereby rendering the Defendants' motion to dismiss moot. Docket No. 17. The next day, the Court entered an order terminating the motion. The Defendants filed a renewed motion to dismiss on December 6, 2010, advancing the same arguments that they had raised in support of their earlier motion. Docket No. 20. That motion is the subject of this memorandum opinion.

III.    **Standards of Review**

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's subject-matter jurisdiction over the plaintiffs' claims. FED. R. CIV. P. 12(b)(1). "At issue in a Rule 12(b)(1) motion is the court's 'very power to hear the case.'" *Judkins v. HT Window Fashions Corp.*, 514 F.Supp.2d 753, 759 (W.D.Pa. 2007), quoting *Mortensen v. First*

*Federal Savings & Loan Association*, 549 F.2d 884, 891 (3d Cir. 1977). As the party asserting that jurisdiction exists, the plaintiff bears the burden of showing that his or her claims are properly before the court. *Development Finance Corp. v. Alpha Housing & Health Care*, 54 F.3d 156, 158 (3d Cir. 1995). In reviewing a Rule 12(b)(1) motion, a court must determine whether the attack on its jurisdiction is a facial attack or a factual attack. A facial attack challenges the sufficiency of the plaintiff's pleadings on jurisdictional grounds. *Petruska v. Gannon University*, 462 F.3d 294, 302, n. 3 (3d Cir. 2006). When considering a facial attack, a court must accept the allegations contained in the plaintiff's complaint as true. *Id.* A factual attack on the court's jurisdiction must be treated differently. *Id.* When considering a factual attack, the court does not attach a presumption of truthfulness to the plaintiff's allegations, and the existence of disputed material facts does not preclude the court from deciding for itself whether jurisdiction over the plaintiff's claims can be properly exercised. *Mortensen*, 549 F.2d at 891.

In light of the United States Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), a complaint may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008), quoting *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, ___U.S.___, ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). This standard requires more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The complaint must allege a sufficient number of facts "to raise a right to relief above the speculative level." *Id.* This

requirement is designed to facilitate the notice-pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires "a short and plain statement of [a] claim *showing* that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2)(emphasis added).

In considering a motion to dismiss filed pursuant to Rule 12(b)(6), a court accepts all of the plaintiff's allegations as true and views all reasonable inferences drawn from those allegations in the light most favorable to the plaintiff. *Buck v. Hampton Township School District*, 452 F.3d 256, 260 (3d Cir. 2006). Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion School District*, 132 F.3d 902, 906, n. 8 (3d Cir. 1997). The primary question in deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The purpose of a motion to dismiss is to "streamline[] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). In addition to the allegations contained in the complaint, a court may consider matters of public record, exhibits attached to the complaint, and other items appearing in the record of the case. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384, n. 2 (3d Cir. 1994).

IV.     **Discussion**

Burns brings her claims against the Secretary and Hart pursuant to 42 U.S.C. § 1983, which provides:

**§ 1983.  Civil action for deprivation of rights**
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. Section 1983 "does not create substantive rights," but instead "provides a remedy for the violation of rights conferred by the Constitution or other statutes." *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federal constitutional or statutory right. *Collins v. City of Harker Heights*, 503 U.S. 115, 119, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)(remarking that § 1983 "does not provide a remedy for abuses that do not violate federal law"). "Section 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." *Board of County Commissioners v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), quoting *Daniels v. Williams*, 474 U.S. 327, 330, 88 L.Ed.2d 662, 106 S.Ct. 662 (1986).

The first step in the Court's analysis is to "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). All of Burns' claims arise under the Due Process Clause of the Fourteenth Amendment. Docket No. 17 at ¶¶ 106-157. The Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST., AMEND. XIV, § 1. Burns alleges that the Defendants violated her rights under the Due Process Clause by classifying her as an "indicated" child abuser on the basis of insufficient evidence, by failing to provide her with a pre-deprivation hearing prior to taking that action, by failing to provide her with a timely post-deprivation hearing, and by preventing her

from obtaining access to documents that were of critical importance to her case. Docket No. 17 at ¶¶ 107-108, 129-133, 149-155. She challenges the constitutionality of the CPSL both on its face and as applied to her particular situation.

### A. The Jurisdictional Challenge Concerning the Official-Capacity Claims

Burns seeks declaratory and injunctive relief against the Secretary. Docket No. 17 at ¶¶ 106-133, 156-157. The Secretary challenges the Court's subject-matter jurisdiction to entertain Burns' official-capacity claims against him on two separate grounds. Docket No. 21 at 3-11. First, he argues that the claims are barred by the Eleventh Amendment. *Id.* at 3-7. Second, he contends that there is no live "Case" or "Controversy" within the meaning of Article III insofar as Burns seeks prospective relief. *Id.* at 7-11. These arguments will be addressed in sequential order.

### 1. The Eleventh Amendment

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST., AMEND. XI. Although its precise language is relatively narrow in scope, the Eleventh Amendment has been construed by the Supreme Court "to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). This presupposition is based on the understanding that "the States entered the federal system with their sovereignty intact," that "[t]he Judicial power of the United States" is limited by this sovereignty, and that a State will not be subjected to suits in federal court brought by private individuals unless it has consented to

such suits either expressly or in the "plan of the convention."[13] *Id.* Pennsylvania has not waived its immunity from suit in federal court. 42 PA. CONS. STAT. § 8521(b). The Secretary contends that the Court lacks subject-matter jurisdiction to adjudicate the claims asserted against him. Docket No. 21 at 3-7.

Congress has the constitutional authority to enact legislation designed to "enforce" the substantive provisions of the Fourteenth Amendment. U.S. CONST., AMEND. XIV, § 5. When it validly invokes this power, Congress may abrogate the States' Eleventh Amendment immunity and subject them to suits brought by private individuals. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). When Congress takes this action, it must make its intention to abrogate the States' constitutionally-secured immunity from suit "unmistakably clear in the language of the statute" authorizing the types of civil actions in question. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Since § 1983 does not contain language evincing a legislative intent to subject the States to suits for money damages, it has not been construed by the Supreme Court as an abrogation of the States' Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332, 342-343, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). In this vein, the Supreme Court has determined that the States are not "persons" subject to suit under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 62-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). An official-capacity suit brought against a state official is no different from a suit brought against the State itself, since an award of damages arising therefrom must be executed against the assets of the State rather than against the personal

---

[13] The "plan of the convention" contemplated waivers of the States' sovereign immunity in certain instances. For example, "the States consented to suits brought by other States or by the Federal Government" when they ratified the Constitution. *Alden v. Maine*, 527 U.S. 706, 755, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). The Supreme Court has also held that, "[i]n ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts." *Central Virginia Community College v. Katz*, 546 U.S. 356, 378, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006). The States did not consent to suits brought by private individuals when they ratified the Constitution. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

assets of the named official.[14] *Kentucky v. Graham*, 473 U.S. 159, 165-166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). For this reason, the Supreme Court has explained that a state official sued in his or her official capacity for monetary relief is not a "person" within the meaning of § 1983. *Will*, 491 U.S. at 71.

Apparently recognizing that the Secretary (in his official capacity) is not a "person" subject to suit for money damages under § 1983, Burns seeks only prospective relief against him. Docket No. 26 at 6. Strictly speaking, the form of relief sought by a plaintiff has no bearing on whether his or her action against a State is barred by the Eleventh Amendment. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Nevertheless, the nature of the relief sought by an individual often makes a difference when a petitioner brings an official-capacity action against a state official. A state official sued in his or her official capacity for prospective relief is a "person" within the meaning of § 1983, since an official-capacity action brought against a state official by a plaintiff seeking prospective relief is not treated as an action against the State. *Will*, 491 U.S. at 71, n. 10. This principle is rooted in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), in which the Supreme Court declared:

> The act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to

---

[14] The distinction between an official-capacity suit and a personal-capacity suit turns on the capacity in which the named defendant has been *sued*. It does not turn on the capacity in which he or she has *acted*. A state official can be held *personally* liable under § 1983 for his or her *official* acts. *Hafer v. Melo*, 502 U.S. 21, 27-31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Young*, 209 U.S. at 159-160. In light of *Young*, the Eleventh Amendment ordinarily raises no bar to an official-capacity action brought against a state official by a plaintiff seeking prospective relief to end an *ongoing violation* of federal law. *Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).

In support of his motion to dismiss, the Secretary argues that Burns does not sufficiently allege an "ongoing violation of federal law" to invoke the rule established in *Young* and circumvent the immunity that he otherwise enjoys under the Eleventh Amendment. Docket No. 21 at 3-7. He evidently believes that the nature of the relief sought by a plaintiff somehow turns on the plaintiff's subjective motivations for bringing an action. The Secretary's argument is based on a misunderstanding of the inquiry required under *Young*. In this context, the *only* relevant question is whether Burns' second amended complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."[15] *Verizon Maryland, Inc. v. Public Service Commission*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), quoting *Coeur D'Alene Tribe*, 521 U.S. at 296 (O'Connor, J., concurring in part and concurring in the judgment). Burns alleges that the CPSL is *facially* unconstitutional. Docket No. 17 at ¶¶ 106-123, 128-133. It is beyond dispute that the Secretary enforces and administers this statute. As the language in *Young* makes clear, the continued enforcement and application of an

---

[15] The Secretary mistakenly believes that Burns' perceived lack of standing to seek prospective relief warrants a determination that her claims are barred by the Eleventh Amendment. Docket No. 21 at 7. Nonetheless, the question of whether the requested relief is barred by the Eleventh Amendment does not turn on whether Burns *herself* has standing to seek such relief. *Palomar Pomerado Health System v. Belshe*, 180 F.3d 1104, 1108 (9th Cir. 1999)(recognizing that while *Young* may be sufficient to overcome a State's otherwise valid defense under the Eleventh Amendment, it does not provide a plaintiff with standing to seek prospective relief); *Summit Medical Associates, P.C. v. James*, 998 F.Supp.2d 1339, 1350 (M.D.Ala. 1998)(referring to the availability of prospective relief under *Young* and a particular plaintiff's standing to seek such relief as distinct issues).

unconstitutional state statute is *itself* an ongoing violation of federal law. *Young*, 209 U.S. at 159-160. The relief sought by Burns (in relation to the Secretary) is clearly prospective in nature. She seeks an injunction barring the future enforcement of the statutory provisions alleged to be unconstitutional. Docket No. 17 at ¶¶ 106-133. The *relief* that she requests is *not* retrospective. The inquiry as to whether Burns can proceed under *Young* does not include an analysis of the merits of her claims. *Verizon Maryland, Inc.*, 535 U.S. at 646. Furthermore, it is of no significance that past injuries may have *motivated* Burns' decision to bring this action. *Smith v. Secretary of the Army*, 384 F.3d 1288, 1294 (Fed.Cir. 2004)(explaining that the "subjective motivations" underlying an action "do not govern the issue of jurisdiction"). Since Burns seeks *prospective* relief (*i.e.*, an order enjoining the *future* enforcement of certain statutory provisions) to redress an *ongoing violation* of federal law (*i.e.*, the *continued enforcement* of statutory provisions alleged to be unconstitutional), this case falls squarely within the rule established by the Supreme Court in *Young*. The Eleventh Amendment provides the Secretary with no *defense* against the official-capacity claims asserted by Burns in this case.

### 2. Standing

Like all other Article III tribunals established by Congress, this Court exercises "[t]he judicial Power of the United States." U.S. CONST., ART. III, § 1. This power is validly exercised only where a live "Case" or "Controversy" exists between the parties. *Id.* An action does not constitute a justiciable "Case" or "Controversy" unless the person bringing the action has the proper legal "standing" to do so. *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In order for a plaintiff to have Article III standing, he or she must establish that: (1) he or she has suffered an "injury in fact" (*i.e.*, an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, and not merely conjectural or

hypothetical); (2) there is a causal relationship between his or her injury and the alleged conduct of the defendant; and (3) it is likely that the injury will be redressed by a decision rendered in his or her favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff must establish standing separately for each form of relief that he or she seeks. *Toll Brothers, Inc. v. Township of Readington*, 555 F.3d 131, 138, n. 5 (3d Cir. 2009). While a past injury attributable to the misconduct of a defendant is generally sufficient to provide a plaintiff with standing to seek monetary relief, it does not provide him or her with standing to seek prospective relief unless he or she is likely to suffer similar harm in the future if the requested relief is not provided. *Stack v. City of Hartford*, 170 F.Supp.2d 288, 293-294 (D.Conn. 2001); *Charron v. Picano*, 811 F.Supp. 768, 775 (D.R.I. 1993).

There is no question that Burns and the Secretary were involved in a live "Controversy" between the commencement of Hart's investigation in November 2008 and the removal of Burns' name from the central register in April 2009. The "case-or-controversy requirement" of Article III, however, "subsists through all stages of federal judicial proceedings." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). A plaintiff cannot demonstrate the continued existence of a "Case" or "Controversy" simply by showing that a justiciable dispute existed when his or her lawsuit was filed. *Id.* When a case becomes moot, a federal court is deprived of its power to act, since there is nothing left for the court to remedy. *Spencer v. Kemna*, 523 U.S. 1, 18, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). "[A] case is moot when the issues are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The Secretary contends that Burns lacks a legally cognizable interest in securing prospective relief, since her name is no longer listed in the central register. Docket No. 21 at 7-11.

In response to the Secretary's jurisdictional challenge, Burns argues that the Court has jurisdiction to adjudicate her official-capacity claims pursuant to an established exception to the mootness doctrine for disputes that are "capable of repetition" but nevertheless evade judicial review.  Docket No. 26 at 6-9.  This exception to the mootness doctrine "applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'"  *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007), quoting *Spencer*, 523 U.S. at 17.  Burns asserts that a challenge to an investigation commenced under the CPSL could not be fully litigated during the investigatory period, which cannot extend beyond 60 days (and which typically concludes within 30 days).  23 PA. CONS. STAT. § 6368(c).  She contends that her status as the owner and operator of Helping Hands creates a reasonable expectation that she will again be subjected to a child-abuse investigation.  Docket No. 26 at 6-9.  For these reasons, Burns believes that the Court should consider the merits of her official-capacity claims.

While some of Burns' official-capacity claims relate to the investigatory period, others relate to statutory procedures which postdate that period.  Docket No. 17 at ¶¶ 106-133.  In any event, however, all of the claims involve challenges to procedures to which Burns was no longer being subjected when she commenced this action.  Burns' name was removed from the central register on April 20, 2009.  *Id.* at ¶ 101.  This action was not commenced until April 24, 2010. Docket No. 1.  The Supreme Court has consistently held that the exception to the mootness doctrine invoked by Burns cannot be relied upon to revive a dispute that was already moot before the commencement of the action at issue.  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 191, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)(explaining that

"if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum"); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 109, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)(remarking that a presumption of future injury typically applied "to refute the assertion of mootness by a defendant who . . . ceases the complained-of activity . . . when sued in a complaint that alleges present or threatened injury" cannot be invoked "as a substitute for the allegation of present or threatened injury upon which initial standing must be based"); *Renne v. Geary*, 501 U.S. 312, 320, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991)(declaring that "the mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced").  The exception can be applied only where an already-commenced action becomes moot because of subsequent developments.  Given that her earlier dispute with the Secretary became moot prior to the commencement of this action, Burns must show that she has standing to seek prospective relief "in the first instance" in order to proceed with her official-capacity claims.  *Romano v. SLS Residential, Inc.*, 246 F.R.D. 432, 440 (S.D.N.Y. 2007).  It is more difficult for a plaintiff to surmount this hurdle than it is for him or her to establish the "reasonable expectation" of future injury needed to save a case from mootness.  *Friends of the Earth, Inc.*, 528 U.S. at 190 (stating that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness").

In order to show that she has standing to seek prospective relief against the Secretary, Burns must show *both* that she is likely to find herself in the same or similar circumstances giving rise to the allegedly unconstitutional conduct *and* that she is likely to again be subjected to the allegedly unconstitutional conduct.  *Travelers Social Club v. City of Pittsburgh*, 685 F.Supp.

929, 932 (W.D.Pa. 1988). It is reasonable to assume that Burns will again be subjected to the allegedly unconstitutional conduct of the Secretary if she is subjected to a future investigation, since that conduct is essentially directed by a statutory scheme that remains in effect. The more difficult question is whether she is likely to find herself in similar circumstances again. Referring to the issue of standing in *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court observed:

> It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.

*Lyons*, 461 U.S. at 107, n. 8 (emphasis in original).[16] In light of the Supreme Court's admonition in *Lyons*, Burns' "subjective apprehensions" cannot control the determination as to whether the future harm that she fears is "actual or imminent" rather than "conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)(internal quotation marks omitted).

Burns alleges that she is likely to be the subject of additional child-abuse investigations in the future because she continues to own and operate Helping Hands and intends to remain in the child-care services profession. Docket No. 17 at ¶ 112. She posits no other basis for establishing her standing to seek prospective relief against the Secretary. Docket No. 26 at 6-9. Her status as the owner and operator of a child-care facility does not provide her with standing to seek the declaratory and injunctive relief that she seeks. *Mosby v. Ligon*, 418 F.3d 927, 933-934 (8th Cir. 2005)(recognizing that an attorney's status as a member of the bar does not afford him

---

[16] The Supreme Court also noted that "emotional upset is a relevant consideration in a damages action." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107, n. 8, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Thus, Burns' "subjective apprehensions" about the prospect of future investigations may be relevant to her personal-capacity claims against Hart.

or her standing to prospectively attack the implementation of the professional disciplinary procedures applicable to attorneys practicing in a particular jurisdiction); *Brown v. Fauver*, 819 F.2d 395, 400, n. 5 (3d Cir. 1987)(holding that a prisoner cannot establish his or her standing to prospectively challenge the validity of a facility's disciplinary procedures simply by referring to his or her status as an individual incarcerated in that facility). Burns does not allege that she has been classified as an individual with a propensity to mistreat children, that other individuals are likely to submit reports accusing her of child abuse, or that she has been repeatedly subjected to child-abuse investigations in the past.[17] *Doe v. Kearney*, 329 F.3d 1286, 1293 (11th Cir. 2003); *Rindley v. Gallagher*, 890 F.Supp. 1540, 1551 (S.D.Fla. 1994); *Schwimmer v. Kaladjian*, 834 F.Supp. 93, 97-98 (S.D.N.Y. 1993). Moreover, she does not contend that she intends to "engage in a course of conduct arguably affected with a constitutional interest" but nevertheless proscribed by a statute that she wishes to challenge. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Since Pennsylvania clearly has the constitutional authority to prohibit the abuse of children, the Court must assume that Burns will not engage in conduct which increases the likelihood that she will once again become the subject of an investigation. *O'Shea v. Littleton*, 414 U.S. 488, 496-497, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

Burns does not have standing to seek declaratory and injunctive relief against the Secretary. Given this lack of standing, no "Case" or "Controversy" exists between Burns and the Secretary justifying the issuance of prospective relief. The Court is without jurisdiction to entertain Burns' official-capacity claims. *Spencer*, 523 U.S. at 18. Accordingly, the Defendants'

---

[17] The Supreme Court has explained that the "past wrongs" suffered by a plaintiff constitute "evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

motion to dismiss will be granted with respect to the claims asserted against the Secretary, and the Secretary will be dismissed as a party to this case.

## B.    The Merits of the Personal-Capacity Claims

Because the personal-capacity claims asserted against Hart seek monetary compensation for actual past injuries rather than prospective relief from speculative or conjectural future injuries, Burns clearly has standing to proceed with her personal-capacity claims. *Lyons*, 461 U.S. at 109.  Since the official-capacity claims against the Secretary cannot proceed, the Court need only consider Burns' constitutionally-based arguments insofar as they relate to the alleged conduct of Hart and the personal-capacity claims against him.[18]  Docket No. 17 at ¶¶ 134-155. At this point, the Court has no occasion to consider whether the administrative protections afforded to accused individuals under the CPSL are sufficient to satisfy the demands of the Constitution.[19]  *Id.* at ¶¶ 106-133, 156-157.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. CONST., AMEND. XIV, § 1.  This constitutional provision provides individuals with "both substantive and procedural rights."  *Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114

---

[18] The Declaratory Judgment Act provides, in pertinent part, that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  A plaintiff wishing to obtain declaratory relief related to a past injury must ordinarily "demonstrate either continuing harm or a real and immediate threat of repeated injury in the future."  *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003).  Declaratory relief is not available to a plaintiff who merely alleges "past exposure to unconstitutional state action."  *Brown v. Fauver*, 819 F.2d 395, 399-400 (3d Cir. 1987).  Unlike her request for injunctive relief, which is directed only at the Secretary, Burns' request for declaratory relief appears to be asserted against both the Secretary and Hart.  Docket No. 17 at ¶¶ 106-133, 156-157.  Nevertheless, Burns lacks standing to seek declaratory relief against Hart for the same reasons that she lacks standing to seek declaratory and injunctive relief against the Secretary.

[19] Although the constitutional validity of Pennsylvania's statutory scheme as a whole is no longer at issue, the content of the challenged statutory provisions may still affect the Court's consideration of Burns' personal-capacity claims against Hart.  *Reilly v. City of Atlantic City*, 532 F.3d 216, 236 (3d Cir. 2008)(explaining that "the availability and validity of any pre-deprivation process must be analyzed with reference to the context of the alleged violation and the adequacy of available post-deprivation remedies").

(1994)(plurality opinion). "[B]y barring certain government actions regardless of the fairness of the procedures used to implement them," the Due Process Clause "serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels*, 474 U.S. at 331, quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277, 18 How. 272, 277, 15 L.Ed. 372 (1856). "By requiring the government to follow appropriate procedures when its agents decide to 'deprive any person of life, liberty, or property,' the Due Process Clause promotes fairness in such decisions." *Daniels*, 474 U.S. at 331. The "substantive" and "procedural" requirements of the Due Process Clause are attributable to these distinct legal principles. *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Burns appears to assert both "substantive" and "procedural" due process claims against Hart. Docket No. 17 at ¶¶ 134-155.

Hart contends that he is entitled to qualified immunity from suit even if Burns properly alleges a violation of the Due Process Clause. Docket No. 21 at 11-20. The Supreme Court has determined that Congress would have expressly made common-law immunities inapplicable to actions brought under § 1983 if it had intended to do so. *Pierson v. Ray*, 386 U.S. 547, 554-555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Therefore, the "qualified immunity" that was available to executive officials at common law is available to defendants such as Hart. *Malley v. Briggs*, 475 U.S. 335, 339-340, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As a general matter, executive officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The primary purpose of qualified immunity is to provide executive officials sued for violating statutory or constitutional rights of uncertain scope with

"the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." *Hope v. Pelzer*, 536 U.S. 730, 740, n. 10, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). In order for a right to be "clearly established" for purposes of qualified immunity, its contours must be "sufficiently clear" to enable an objectively reasonable official to understand that what he or she is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). An executive official's qualified immunity includes not only a shield from monetary liability, but also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). For this reason, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)(*per curiam*). Since the inquiry as to whether Hart is entitled to qualified immunity is inextricably intertwined with the merits of Burns' claims, the Court cannot determine whether Hart enjoys immunity from suit under these circumstances without deciding whether Burns properly alleges a violation of the Fourteenth Amendment. *Pearson v. Callahan*, 555 U.S. 223, ___, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

### 1. Procedural Due Process

"In any case involving a procedural due process claim, the first question for consideration is whether the plaintiff has been 'deprived' of a constitutionally-protected liberty or property interest." *Whittaker v. County of Lawrence*, 674 F.Supp.2d 668, 693 (W.D.Pa. 2009). In *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the Supreme Court declared that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him [or her], notice and an opportunity to be

heard are essential." This statement was later clarified in *Paul v. Davis*, 424 U.S. 693, 701, 96

S.Ct. 1155, 47 L.Ed.2d 405 (1976), in which the Supreme Court explained that *Constantineau*

had not established "the proposition that reputation alone, apart from some more tangible

interests such as employment, [was] either 'liberty' or 'property' by itself sufficient to invoke the

procedural protection of the Due Process Clause." The Supreme Court went on to note that

while defamation alone does not constitute a "deprivation" of "liberty" or "property" within the

meaning of the Fourteenth Amendment, "the invocation of procedural safeguards" is

constitutionally required when "the injury resulting from the defamation" is combined with an

"alteration of [one's] legal status" under state law. *Paul*, 424 U.S. at 708-709. The United States

Court of Appeals for the Third Circuit has observed that the Due Process Clause is implicated

when state-occasioned defamation is coupled with the deprivation of a "more tangible interest."

*Baraka v. McGreevey*, 481 F.3d 187, 208 (3d Cir. 2007). The Court of Appeals typically refers

to the judicial inquiry conducted in furtherance of this standard as the "stigma-plus" test. *Hill v.

Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006).

Burns alleges that Hart's "libelous accusation of suspected child abuse" deprived her of

both a liberty interest in her reputation and a property interest in her operating license. Docket

No. 17 at ¶ 110. She also avers that, independent of these interests, she had a constitutionally-

protected property interest in receiving clearance to work in the child-care services profession.

*Id.* at ¶¶ 44-45. Burns' allegations are sufficient to establish, for purposes of the instant motion,

that she was deprived of a constitutionally-protected liberty interest.

There is no question that the listing of Burns as an "indicated" child abuser called into

question her "good name, reputation, honor, or integrity." *Valmonte v. Bane*, 18 F.3d 992, 1000

(2d Cir. 1994). In order to satisfy the "stigma" prong of the "stigma-plus" test, Burns must aver

that the alleged defamatory statements were made *publicly*. *Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)(remarking that a communication that was never made public "cannot properly form the basis for a claim that [a person's] interest in his [or her] 'good name, reputation, honor, or integrity' was thereby impaired")(footnote omitted). She must also allege that the statements were *false*. *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977)(observing that "some factual dispute" must exist "if the hearing mandated by the Due Process Clause is to serve any useful purpose"). The second amended complaint clears both of these hurdles. Burns alleges that, as a result of her status as an "indicated" child abuser, she was instructed to remove herself from Helping Hands and to inform the parents of her students in writing of the incident involving DM. Docket No. 17 at ¶ 85. She further alleges that the suspension of Helping Hands from the Keystone STARS program was announced on a publicly-accessible website, and that she was required to post a notice at the entrance of Helping Hands indicating that her operating license would not be renewed . *Id.* at ¶¶ 86-87. These allegations are clearly sufficient to establish the existence of a "publication."[20] *Tebo v. Tebo*, 550 F.3d 492, 504 (5th Cir. 2008)(noting that the placement of a charge in a "publicly available file" ordinarily suffices to "satisfy the publication requirement"). By describing a version of events that differs significantly from Hart's determination that she had abused DM, Burns sufficiently alleges a "factual dispute" from which the falsity of Hart's allegations can be inferred. Docket No. 17 at ¶¶ 51-62; *Codd*, 429 U.S. at 627.

The "plus" prong of the "stigma-plus" analysis typically presents a more difficult question. A property interest that independently enjoys due process protection constitutes a

---

[20] Since Pennsylvania law requires prospective child-care employees named in the central register to disclose their status to potential employers, the listing of Burns' name in the central register most likely constituted a "publication" in and of itself. 23 PA. CONS. STAT. § 6344(b)(2); *Dupuy v. Samuels*, 397 F.3d 493, 510 (7th Cir. 2005).

sufficient "plus" to bring one's interest in preserving his or her "good name, reputation, honor, or integrity" within the ambit of the "liberty" protected by the Due Process Clause when a state-occasioned deprivation of that property interest is accompanied by governmental defamation. *Dee v. Borough of Dunmore*, 549 F.3d 225, 234 (3d Cir. 2008). Nevertheless, it is not always necessary for a plaintiff to allege the deprivation of an interest entitled to independent due process protection in order to establish the existence of a reputation-based "liberty interest." *Owen v. City of Independence*, 445 U.S. 622, 633, n. 13, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)(explaining that "the due process right to a hearing" is triggered when the dismissal of a government employee with no property interest in his or her position is accompanied by charges or allegations that might seriously damage his or her standing and associations in the relevant community); *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)(suggesting that where the state-occasioned deprivation of a government job to which an individual has no claim of entitlement imposes on him or her "a stigma or other disability that foreclose[s] his [or her] freedom to take advantage of other employment opportunities," the Due Process Clause is implicated); *Hill*, 455 F.3d at 238 (holding that "a public employee who is defamed in the course of being terminated or constructively discharged satisfies the 'stigma-plus' test even if, as a matter of state law, he [or she] lacks a property interest in the job [that] he [or she] lost").

Burns alleges that she had constitutionally-protected property interests in both her license to operate Helping Hands and her ability to receive clearance to work in other child-care positions. Docket No. 17 at ¶¶ 43-44. The Supreme Court has recognized "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference" as being within the categories of "liberty" and "property" entitled to

constitutional protection. *Green v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)(referring to the Due Process Clause of the Fifth Amendment). The Supreme Court has also observed that, at least in some contexts, individuals have constitutionally-protected property interests in "state-issued licenses essential to pursuing an occupation or livelihood." *Cleveland v. United States*, 531 U.S. 12, 25, n. 4, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000). In a recent unpublished decision, the United States Court of Appeals for the Third Circuit stated that the "[n]atural expiration of [a professional] license negates any claim that it is a property interest" protected by the Due Process Clause. *Lockhart v. Matthew*, 83 Fed.Appx. 498, 500-501 (3d Cir. 2003). Burns was allegedly informed that her operating license would not be *renewed* "as a direct result of the improper investigation" conducted by Hart. Docket No. 17 at ¶ 86. It is not clear whether the license was otherwise subject to automatic renewal, or whether Pennsylvania law permits the consideration of factors other than misconduct in the license-renewal decision.[21] *Herz v. Degnan*, 648 F.2d 201, 208 (3d Cir. 1981).

There is also a degree of uncertainty as to whether Burns had a concrete property interest in securing clearance to work in the child-care profession. Under the CPSL, a prospective "child-care services" employee must submit with his or her employment application "[a] certification from the [DPW] as to whether [he or she] is named in the central register as the perpetrator of a founded . . . [or] indicated report of child abuse . . . ." 23 PA. CONS. STAT. § 6344(c). "[P]ersons seeking to operate child-care services" are required to submit this information to the DPW for review. 23 PA. CONS. STAT. § 6344(f). The CPSL specifically prohibits the hiring of an applicant who "is named in the central register as the perpetrator of a founded report of child abuse committed within the five-year period immediately preceding

---

[21] "State law may bear upon a claim under the Due Process Clause when the property interests protected by the Fourteenth Amendment are created by state law." *Davis v. Scherer*, 468 U.S. 183, 193, n. 11, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

verification . . . ." 23 PA. CONS. STAT. § 6344(c)(1). In all candor, it is not clear to the Court why the listing of Burns as an "indicated" child abuser necessitated her immediate removal from Helping Hands and the subsequent nonrenewal of her operating license.[22] The statutory language directly speaks only to "founded" reports of child abuse, and the parties have not explained the causal relationship between the conclusion reached by Hart (*i.e.*, that Burns was an "indicated" child abuser) and the negative consequences suffered by Burns.[23] In any event, the Pennsylvania Supreme Court has recognized that the practical effect of listing an individual's name in the central register is to deprive him or her of the ability to work in the child-care profession. *A.Y. v. Department of Public Welfare*, 641 A.2d 1148, 1152, n. 7 (Pa. 1994).

In *Valmonte v. Bane*, 18 F.3d 992, 1000-1002 (2d Cir. 1994), the United States Court of Appeals for the Second Circuit held that a prospective child-care employee named as an "indicated" child abuser in a state-created "central register" had established the deprivation of a constitutionally-protected liberty interest because the law of New York required potential employers to consult the register before hiring child-care workers. Explaining the reasons for its decision, the Court of Appeals observed:

> Valmonte alleges much more than a loss of employment flowing from the effects of simple defamation. The Central Register does not simply defame Valmonte, it places a tangible burden on her employment prospects. Valmonte has alleged that because of her inclusion on the Central Register, and because all child care providers must consult that list, she will not be able to get a job in the child-care field. In other words, by *operation of law*, her potential employers will be informed specifically about her inclusion on the Central Register and will therefore choose not to hire her. Moreover, if they do wish to hire her, those employers are required by law to explain the reasons why in writing.

---

[22] Burns avers that the Western Regional Children, Youth and Families Office provides documentation explaining that one's classification as an "indicated" child abuser renders him or her unable to work as a licensed child-care provider. Docket No. 17 at ¶ 144. She does not directly explain the statutory or administrative reason why the designation of an individual as an "indicated" child abuser automatically results in such a drastic consequence. It is worth noting that while Hart's letter to Burns informing her of the report against her specified the negative consequences that would result from a finding that the allegations were "founded," it allegedly failed to explain what would happen if she were deemed to be an "indicated" child abuser. *Id.* at ¶ 67.

[23] The parties should address this issue more clearly as the case progresses.

This is not just the tangible deleterious effect that flows from a bad reputation. Rather, it is a specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state. Valmonte is not going to be refused employment because of her reputation; she will be refused employment simply because her inclusion on the list results in an added burden on employers who will therefore be reluctant to hire her.

*Valmonte*, 18 F.3d at 1001 (emphasis in original). The Court of Appeals referred to the listing of

the plaintiff's name in the central register as "a statutory impediment to employment" even

though employers were not absolutely precluded from hiring her. *Id.* at 1002. This "impediment

to employment" was deemed to be "significant enough to satisfy the 'plus' requirement" of the

"stigma-plus" test. *Id.* Other federal appellate courts have utilized the reasoning in *Valmonte* in

similar situations. *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1189-1190 (9th Cir.

2009), reversed on other grounds by *Los Angeles County v. Humphries*, ___U.S.___, 131 S.Ct.

447, 178 L.Ed.2d 460 (2010); *Dupuy v. Samuels*, 397 F.3d 493, 510-512 (7th Cir. 2005).

While it is not entirely clear whether Burns suffered the deprivation of a property interest

entitled to independent constitutional protection, the allegations contained in the second amended

complaint sufficiently allege the deprivation of a reputation-based liberty interest to implicate the

protections of the Due Process Clause.[24] In this case, Burns relies not simply on the negative

implications that Hart's finding had on her employment prospects, but also on more tangible

injuries such as her temporary removal from Helping Hands, the decision not to renew her

operating license, Helping Hands' suspension from the Keystone STARS program, and her loss

of over $30,000.00 in grant money and tuition support. Docket No. 17 at ¶¶ 85-87. The

reasoning employed in *Valmonte* and its progeny inevitably leads to the conclusion that Burns'

"good name, reputation, honor [and] integrity" were at stake *because of what the government*

---

[24] Burns remains free to demonstrate, at a later stage in this litigation, that she was also deprived of more concrete property interests.

*was doing to her*. *Constantineau*, 400 U.S. at 437. The listing of Burns' name in the central register constituted an "alteration of [her] legal status" under Pennsylvania law. *Paul*, 424 U.S. at 708. When "combined with the injury resulting from [] defamation," such an "alteration of legal status" justifies "the invocation of procedural safeguards."[25] *Id.* at 708-709.

"Once it is determined that the Due Process Clause is implicated by a specific deprivation of liberty or property, the relevant question becomes 'what process is due' under the particular circumstances." *Whittaker*, 674 F.Supp.2d at 694, quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "The Fourteenth Amendment does not protect against all deprivations of liberty [or property]. It protects only against deprivations of liberty [or property] accomplished 'without due process of law.'" *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). "The standard for determining what process is due in a given situation is rather flexible, since the due process inquiry eschews reliance on rigid mandates in favor of an approach which accounts for the factual circumstances of the particular situation at issue." *Tristani v. Richman*, 609 F.Supp.2d 423, 481 (W.D.Pa. 2009). The determination as to what the Due Process Clause requires under these circumstances is governed by the general standard set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In *Mathews*, the Supreme Court explained:

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous

---

[25] "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest create by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)(internal citations omitted).

35

deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 334-335. "These factors determine the 'appropriate level of process' required in order for a 'deprivation' of liberty or property to be in accordance with the Due Process Clause." *Whittaker*, 674 F.Supp.2d at 694, quoting *Garcia v. City of Albuquerque*, 232 F.3d 760, 769 (10th Cir. 2000). Once the "appropriate level of process" has been identified, "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of [an individual's] substantive assertions." *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Whittaker*, 674 F.Supp.2d at 694.

As an initial matter, Burns cannot allege a violation of the Fourteenth Amendment simply by averring that Hart violated Pennsylvania law. Burns alleges that Hart violated the CPSL in two respects. The CPSL requires a county agency to "orally notify" the "subject" of a child-abuse report of the existence of the report and all applicable statutory rights before proceeding to interview him or her. 23 PA. CONS. STAT. § 6368(a). Burns claims that she never received this oral notification prior to her interview with Hart. Docket No. 17 at ¶ 65. The CPSL also requires the county agency to have an investigator meet with the child alleged to have been abused within 24 hours of its receipt of a report of suspected child abuse. 23 PA. CONS. STAT. § 6368(a). Burns alleges that Hart first interviewed DM eight days after receiving the report concerning the incident of November 17, 2008. Docket No. 17 at ¶¶ 71-72. These *statutory* violations, however, did not render Hart's alleged conduct *unconstitutional*.[26] *Archie v. Racine*,

---

[26] Although Hart's alleged failure to interview DM within the statutorily-prescribed 24-hour period did not alone render his actions violative of the Due Process Clause, the fact that eight days allegedly elapsed between the submission of the report of suspected child abuse and the interview with DM may have some bearing on whether an

847 F.2d 1211, 1217 (7th Cir. 1988). "While state law may be the source of a [liberty or] property interest entitled to constitutional protection, it does not govern the constitutional analysis concerning the level of process necessary in order to effect a lawful deprivation of that interest." *Whittaker*, 674 F.Supp.2d at 695. Thus, the Court's inquiry must focus on whether Hart violated *constitutional* rights enjoyed by Burns under the Due Process Clause rather than on whether he violated the applicable *statutory* mandates of the CPSL.

The Due Process Clause typically requires that a hearing be conducted *before* an individual is deprived of an important liberty or property interest. *Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Where a pre-deprivation hearing is constitutionally required but not provided, no amount of post-deprivation process is adequate to satisfy the demands of the Due Process Clause. *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008). Where the Due Process Clause does not require a pre-deprivation hearing, the constitutional validity of a state-occasioned deprivation of an individual's liberty or property depends on the availability and adequacy of post-deprivation remedies provided to the individual. *Id.* The *adequacy* of a post-deprivation hearing often turns on whether it is provided in a timely manner. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 547, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)("At some point, a delay in the post-termination hearing would become a constitutional violation."). Burns assails the CPSL for providing neither a pre-deprivation hearing nor a *prompt* post-deprivation hearing to child-care professionals whose names are added to the central register in response to allegations of suspected child abuse. Docket No. 26 at 9-10. As noted earlier, the validity of the CPSL is not presently before the Court, since Burns does not have standing to seek prospective relief against

---

objectively reasonable person in Hart's position could have found the three-year-old child's account of the week-old incident to be credible evidence of abuse.

the Secretary.  The provisions of the CPSL, however, are still relevant to the Court's analysis to the extent that they relate to the actions taken by Hart.  *Reilly v. City of Atlantic City*, 532 F.3d 216, 236 (3d Cir. 2008)(explaining that "the availability and validity of any pre-deprivation process must be analyzed with reference to the context of the alleged violation and the adequacy of available post-deprivation procedures").

Once a "report of suspected child abuse" has been received, a county agency must determine within 60 days whether "substantial evidence of the alleged abuse exists."  23 PA. CONS. STAT. §§ 6303(a), 6368(c).  Although the alleged perpetrator of the abuse may be interviewed as a part of the investigatory process, no adversarial hearing is available to him or her prior to a finding that he or she is an "indicated" child abuser and the listing of his or her name in the central register.  23 PA. CONS. STAT. §§ 6338(a), 6368(a), (c).  If the accused individual commences an administrative appeal within the ensuing 45-day period, the Secretary has 30 days to decide whether to "amend or expunge" the challenged information in the central register.  23 PA. CONS. STAT. § 6341(a)(2), (c).  If the Secretary either denies the appeal or fails to make a decision within 30 days, the accused individual may request an administrative hearing to challenge the listing of his or her name in the central register.  23 PA. CONS. STAT. § 6341(c).  Such a hearing request must be filed within 45 days of the Secretary's action (or inaction) regarding the appeal.  *Id.*  When the hearing is ultimately conducted, "the appropriate county agency" bears the burden of proving the allegations of child abuse.  *Id.*  Nonetheless, the CPSL does not limit the amount of time that the DPW has to conduct a hearing after a hearing request is filed.

Burns avers that while she requested a hearing on January 7, 2009, she would have been forced to wait until April 30, 2009, to clear her name.  Docket No. 17 at ¶ 94.  Hart determined

that Burns was an "indicated" child abuser on December 16, 2008, at which point her name was added to the central register. *Id.* at ¶ 83. Her name remained in the central register until April 20, 2009, when the ALJ was informed that the DPW was not prepared to proceed with the hearing. *Id.* at ¶ 100. Hart's conclusion that "substantial evidence of the alleged abuse exist[ed]" resulted in the listing of Burns' name in the central register for a period of four months. Had the allegations against Burns not been withdrawn, she would have been forced to wait an additional ten days for an opportunity to be heard.

Given the drastic consequences befalling a child-care professional whose name appears in the central register and the amount of time that may pass before he or she is provided with a name-clearing hearing, Burns avers that the Due Process Clause requires a DPW employee such as Hart to properly apply the CPSL's "substantial evidence" standard before finding that a report of suspected child abuse lodged against such a professional is an "indicated report." Docket No. 17 at ¶¶ 134-155. She alleges that "Hart was grossly negligent in his application of the substantial evidence standard," and that his "investigation was of such minimal quality and scope that he had no ability to properly apply [that] standard." *Id.* at ¶¶ 149, 155. She characterizes Hart's "gross negligence" as a violation of her procedural due process rights.[27] *Id.* at ¶ 154.

This type of procedural due process claim directly relates to the evidentiary burden that a State must meet before depriving an individual of a constitutionally-protected liberty or property

---

[27] Even if Hart's alleged failure to properly apply the "substantial evidence" standard could be characterized simply as "negligence" rather than as "gross negligence," Burns would still be able to show that she was "deprived" of a constitutionally-protected liberty interest. In *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Supreme Court held that the Due Process Clause is not implicated by the *unintended* injuries to a person's liberty or property resulting from the *negligent* conduct of a state official. The "negligence" referred to in *Daniels*, however, relates to whether a state official *intends* to "deprive" an individual of liberty or property rather than to whether the proper procedures are followed in connection with that "deprivation." *Daniels*, 474 U.S. at 333-334 ("We think the relevant action of the prison officials in that situation is their *deliberate* decision to deprive the inmate of good-time credit, not their hypothetically *negligent* failure to accord him the procedural protections of the Due Process Clause.")(emphasis added). While Hart may have *negligently* failed to properly apply the "substantial evidence" standard, he clearly *intended* to classify Burns as an "indicated" child abuser. Docket No. 17 at ¶¶ 82-83.

interest.  The evidentiary standard "that is applied most frequently in litigation between private parties" is the "preponderance of the evidence" standard.  *Rivera v. Minnich*, 483 U.S. 574, 577, 107 S.Ct. 3001, 97 L.Ed.2d 473 (1987).  A "preponderance of the evidence" is defined as "[e]vidence which is of greater weight or more convincing than the evidence which is offered in opposition to it," or as "evidence which as a whole shows that the fact sought to be proved is more probable than not."  *Greenwich Collieries v. Director, Office of Workers' Compensation Programs*, 990 F.2d 730, 736 (3d Cir. 1993), quoting BLACK'S LAW DICTIONARY 1182 (6th Ed. 1990).  This evidentiary standard permits the litigants in a civil case to share "the risk of error in roughly equal fashion."  *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).  In many instances, the application of the "preponderance of the evidence" standard is constitutionally permissible.  *Rivera*, 483 U.S. at 577-582; *Vance v. Terrazas*, 444 U.S. 252, 264-267, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980).

Notwithstanding the constitutional validity of the "preponderance of the evidence" standard in various contexts, there are some instances in which the Due Process Clause requires a greater quantum of evidence before a State may deprive an individual of important liberty or property interests.  The constitutional requirement that the State meet a heavier evidentiary burden when important private interests are at stake is rooted in the understanding that "[t]he individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the [S]tate."  *Addington*, 441 U.S. at 427.  Where "the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money,'" the Due Process Clause may require that the statutory predicates to the challenged deprivation be proven by "clear and convincing evidence."  *Santosky v. Kramer*, 455 U.S. 745, 756, 102 S.Ct. 1388, 71

L.Ed.2d 599 (1982), quoting *Addington*, 441 U.S. at 424. In the criminal context, "the Due Process Clause protects the accused against conviction except based upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he [or she] is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

On the other side of the spectrum are circumstances in which the Due Process Clause permits a state-occasioned deprivation to occur on the basis of evidence that falls short of the "preponderance of the evidence" standard. In *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), the Supreme Court held that where a prison inmate's violation of a prison rule results in a loss of "good time credits," the Due Process Clause requires only that "some evidence" support the disciplinary board's finding that the inmate committed the alleged infraction.[28] An inquiry as to whether this standard has been satisfied does not require an "examination of the entire record," an "independent assessment of the credibility of witnesses," or a "weighing of the evidence." *Hill*, 472 U.S. at 455. In the prison-based disciplinary context, "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455-456. This lower evidentiary threshold reflects the unique nature of the prison environment, which calls for "minimal" due process requirements. *Thompson v. Owens*, 889 F.2d 500, 502 (3d Cir. 1989).

The CPSL defines the term "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 PA. CONS. STAT. § 6303(a). The plain language of this definition suggests that

---

[28] The "good time credits" at issue in *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 447, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), constituted property interests under Massachusetts law. Inmates who complied with prison rules were able to accumulate "good time credits" for the purpose of reducing their terms of imprisonment. *Hill*, 472 U.S. at 447.

an investigator such as Hart must consider not only evidence which supports a finding of child abuse, but also any "inconsistent evidence" that may point toward a contrary conclusion.  Burns alleges that Hart failed to consider "inconsistent evidence" in determining that she was an "indicated" child abuser.  Docket No. 17 at ¶ 149.  Specifically, Burns avers that Hart was "grossly negligent" in crediting DM's account of the alleged abuse despite the fact that she was only three years old, and notwithstanding the fact that eight days had passed since the alleged incident; in crediting the account of the incident provided by DM's five-year-old sister, who had not been in the kitchen when DM was lifted into the high chair; in failing to consider the statements from Helping Hands employees indicating that DM had complained of a sore elbow before being lifted into the high chair; in failing to consider the statements from Helping Hands employees suggesting that DM had exhibited no signs of distress while being lifted into the high chair; and in failing to view the layout of the facility for the purpose of determining whether the accounts provided by DM and her sister were plausible.  *Id.*  Burns claims that the "CY-48" form completed by Hart listed no "inconsistent evidence," and that only the statements given by DM and her sister and a medical report documenting DM's elbow injury were actually considered as a part of Hart's decisionmaking process.  *Id.* at ¶ 90.  The "CY-48" form was apparently the only piece of documentary evidence provided to Burns during the course of the administrative proceedings.  *Id.* at ¶¶ 89, 152.

Burns contends that Hart's failure to properly apply the "substantial evidence" standard constituted a violation of her procedural due process rights.  Docket No. 26 at 11.  At this stage, the Court must assume that Burns' allegations are true, and that Hart failed to properly consider evidence that was "inconsistent" with his finding that DM had been abused.  *Buck*, 452 F.3d at 260.  Nevertheless, Hart's alleged failure to properly apply the "substantial evidence" standard

constituted a violation of the Due Process Clause only if a showing of "substantial evidence" was *constitutionally* required before Burns could be deprived of the liberty interest in question. A state official's failure to properly apply a *statutory* evidentiary standard does not run afoul of the Constitution unless the Due Process Clause *itself* requires the evidentiary showing reflected in that standard. *Swarthout v. Cooke*, ___U.S.___, ___, 131 S.Ct. 859, 178 L.Ed.2d 732, 736-737 (2011). Therefore, the Court must determine the extent to which a showing of "substantial evidence" was *constitutionally* required in this context.

In *Valmonte*, the United States Court of Appeals for the Second Circuit characterized the plaintiff's "private interest" as an interest in securing future employment in the child-care field without the "defamatory label" placed on her by the State. *Valmonte*, 18 F.3d at 1003. It was acknowledged that the State had "a significant interest in protecting children from abuse and maltreatment." *Id.* The "deciding factor" in that case was the "risk of an erroneous deprivation" that resulted from New York's use of a "some credible evidence" standard in determining whether the name of an accused individual should be added to the central register. *Id.* The "some credible evidence" standard did not require the factfinder "to weigh conflicting evidence," thereby forcing the accused individual to "bear the brunt of the risk" that an inaccurate determination would be made. *Id.* at 1004. The challenged New York statute did not require the State to prove an allegation of child abuse by a "preponderance of the evidence" until *after* the accused individual had already been denied employment because of the listing of his or her name in the central register. *Id.* at 1002-1003. The Court of Appeals determined that the "some credible evidence" standard was constitutionally impermissible in this context, since it did not require the factfinder "to weigh evidence and judge competing versions of events." *Id.* at 1004.

In *Dupuy v. Samuels*, 397 F.3d 493, 497 (7th Cir. 2005), the United States Court of Appeals for the Seventh Circuit considered the validity of an Illinois statute permitting the listing of an accused individual's name in a "central register" upon a showing of "credible evidence" that he or she had abused a child.  Under a regulation promulgated by the Illinois Department of Children and Family Services, "credible evidence" of child abuse or neglect existed where "the available facts when viewed in light of surrounding circumstances would cause a reasonable person to believe that a child was abused or neglected."  *Dupuy*, 397 F.3d at 497.  Pursuant to an injunction issued by the United States District Court for the Northern District of Illinois, state officials were required to apply the "credible evidence" standard in a way that accounted for "both inculpatory and exculpatory" evidence.  *Dupuy v. McDonald*, Civil Action No. 97-4199, 2003 WL 21557911, at *5, 2003 U.S. Dist. LEXIS 12019, at *14 (N.D.Ill. July 10, 2003).

Considering this evidentiary standard in light of the injunction, the Court of Appeals explained:

> We believe that the more rigorous interpretation of the "credible evidence" standard required by the district court's order is an appropriate measure at the pre-indication stage.  As understood by the district court, this standard requires that the investigator not simply identify some evidence that supports an indicated finding.  It also requires that the investigator take into account *all* of the available evidence that tends to show that abuse or neglect did *or* did not occur.  Only then may the investigator decide whether that totality of evidence would cause a reasonable individual to believe that a child was abused or neglected.

*Dupuy*, 397 F.3d at 505-506.  The approval of the modified "credible evidence" standard in *Dupuy* was partially premised on the availability of a pre-deprivation hearing conducted by an official other than the original investigator, which provided the accused individual with the opportunity to present his or her "side of the story" before being classified as an "indicated" child abuser.  *Id.* at 506-507.

Valmonte and Dupuy both stand for the proposition that the Due Process Clause requires a State to consider both inculpatory and exculpatory evidence *before* classifying an accused individual as an "indicated" child abuser and listing his or her name in a "central register" accessible to potential employers. Regardless of whether the evidentiary standard is described as a "preponderance of the evidence," "credible evidence" or "substantial evidence," it is clear that the Constitution requires a State to weigh conflicting evidence before labeling a child-care professional as an abuser of children. *Valmonte*, 18 F.3d at 1003-1005; *Dupuy*, 397 F.3d at 504-507. This situation is not akin to the prison context, in which an inmate can be lawfully deprived of "good time credits" on the basis of "some evidence" that he or she has violated a prison rule, without reference to conflicting evidence. *Hill*, 472 U.S. at 455-457. A child-care professional has an important liberty interest in avoiding the stigma associated with false allegations of child abuse bearing the imprimatur of the State. *Dupuy*, 397 F.3d at 505. When such a professional can be classified as an abuser of children pursuant to an evidentiary standard that fails to account for exculpatory evidence, the risk that he or she will be erroneously deprived of that liberty interest is intolerably high.[29] *Mathews*, 424 U.S. at 335; *Valmonte*, 18 F.3d at 1003-1005.

The second amended complaint, when read in the light most favorable to Burns, clearly alleges that Hart's investigation accounted only for evidence suggesting that DM had been abused, and that evidence suggesting the contrary was never considered. Docket No. 17 at ¶¶ 71-83, 149-155. Indeed, the factual support for Hart's determination is alleged to have been so deficient that the DPW never bothered to present a case against Burns. *Id.* at ¶ 100. Because the Due Process Clause required Hart to consider both inculpatory and exculpatory evidence *before* classifying Burns as an "indicated" child abuser, Burns will have an opportunity to demonstrate

---

[29] Burns alleges that 67% of the accused individuals who administratively challenged their classifications in 2008 were ultimately exonerated. Docket No. 17 at ¶¶ 32-33.

that no reasonable investigator in Hart's position could have concluded, based on *all* of the available evidence, that she had abused DM. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)(describing "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction" as "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt").

The Supreme Court's decisions in *Parratt v. Taylor*, 451 U.S. 527, 541-544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), illustrate that where a "deprivation" of liberty or property is brought about by the "random and unauthorized" actions of a state official, the availability of an adequate post-deprivation tort remedy satisfies the requirements of the Due Process Clause.[30]  The Fourteenth Amendment does not require a State to "engage in the impossible task" of providing a pre-deprivation hearing prior to every unanticipated action taken by its officials. *Whittaker*, 674 F.Supp.2d at 694 (internal quotation marks omitted).  In contrast, the availability of a post-deprivation tort remedy does not necessarily satisfy the requirements of the Constitution when a deprivation occurs in "the more structured environment of established state procedures." *Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996).

The second amended complaint does not explain whether Pennsylvania provides Burns with a tort remedy to compensate her for the injuries allegedly caused by Hart's misconduct. The question of whether such a remedy exists, however, is inconsequential under these

---

[30] Although *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), was overruled by *Daniels v. Williams*, 474 U.S. 327, 330-331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), to the extent that it had treated an unintended loss of property attributable to the negligence of a state official as a "deprivation" of property within the meaning of the Due Process Clause, it remains good law to the extent that it held that a post-deprivation tort remedy constitutes the "due process" required under the Fourteenth Amendment when the "deprivation" at issue is caused by the "random" or "unauthorized" actions of a state official. *Brown v. Muhlenberg Township*, 269 F.3d 205, 213-214 (3d Cir. 2001).

circumstances. Burns' allegations straddle the line between a facial attack on the CPSL's "substantial evidence" standard and an "as applied" challenge to Hart's application of that standard. Docket No. 17 at ¶¶ 15-17, 125, 147-149. Specifically, Burns alleges *both* that the CPSL provides no guidance as to how comprehensive an investigation must be to produce "substantial evidence" of abuse *and* that Hart failed to properly consider exculpatory evidence that was plainly available to him. *Id.* at ¶¶ 15-17, 125, 142-155. Although Burns' procedural due process claim is premised, at least to some extent, on Hart's alleged failure to follow proper statutory procedures, the Supreme Court's decision in *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), counsels in favor of her position in this case.

The plaintiff in *Zinermon* alleged that the defendants had deprived him of liberty "without due process of law" by permitting him to "voluntarily" admit himself to a mental hospital in Florida for inpatient treatment even though his condition at the time of admission had rendered him incapable of giving "informed consent" to "voluntary" treatment. *Zinermon*, 494 U.S. at 115. Although the statute authorizing the voluntary admission of those in need of treatment did not permit incompetent persons to be admitted "voluntarily," it contained no provision specifically directing hospital officials to ensure that those patients seeking admission were actually capable of consenting to inpatient treatment. *Id.* at 135. The defendants argued that the plaintiff's claims were based on an alleged departure from the Florida statute providing for the voluntary admission of those capable of giving informed consent to inpatient treatment, and that the tort remedies available under Florida law for this alleged statutory violation provided the plaintiff with the "due process" required under the Fourteenth Amendment. *Id.* at 115-116. The Supreme Court rejected the defendants' argument by stating as follows:

> It may be permissible constitutionally for a State to have a statutory scheme like Florida's, which gives state officials broad power and little guidance in admitting

47

mental patients. But when those officials fail to provide constitutionally required procedural safeguards to a person whom they deprive of liberty, the state officials cannot then escape liability by invoking *Parratt* and *Hudson*. It is immaterial whether the due process violation Burch alleges is best described as arising from petitioner's failure to comply with state procedures for admitting voluntary patients, or from the absence of a specific requirement that petitioners determine whether a patient is competent to consent to voluntary admission. Burch's suit is neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws. Burch is not simply attempting to blame the State for misconduct by its employees. He seeks to hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue.

*Id.* at 135-136. Since it was "foreseeable" that the type of deprivation at issue would occur "at a predictable point in the admission process," the Supreme Court held that the Due Process Clause required more than a post-deprivation tort remedy, and that the plaintiff had properly alleged a violation of the Fourteenth Amendment irrespective of whether such a remedy was available under Florida law.[31] *Id.* at 139.

The rationale articulated by the Supreme Court in *Zinermon* applies with equal force in this case. Although Burns alleges that Hart failed to properly comply with Pennsylvania's statutory procedures, the "deprivation" at issue was affirmatively *authorized* by the provisions of the CPSL. *Id.* at 138. Even if Hart's alleged conduct was not in full conformity with Pennsylvania law, the "deprivation" of Burns' constitutionally-protected liberty interest cannot be fairly characterized as "random and unauthorized." *Id.* at 136-139; *Hudson*, 468 U.S. at 533. Burns need not aver that no adequate post-deprivation tort remedy for her injuries exists under Pennsylvania law in order to state an actionable claim under the Due Process Clause. *Zinermon*,

---

[31] It is axiomatic that a completed federal constitutional violation is actionable under § 1983 regardless of whether a parallel remedy is available under state law. *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), overruled on other grounds by *Monell v. Dept. of Social Services*, 436 U.S. 658, 663, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The availability of a post-deprivation tort remedy is germane to the procedural due process inquiry only to the extent that it relates to whether a violation of the Due Process Clause can be established in the first place. *Zinermon v. Burch*, 494 U.S. 113, 125-126, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

494 U.S. at 136-139. Accordingly, the averments contained in the second amended complaint properly allege a violation of the Fourteenth Amendment.[32]

### 2. Substantive Due Process

"In order to establish that the interest-depriving actions of a governmental entity or official constituted a substantive due process violation, a plaintiff must show *both* that the particular interest at issue was entitled to constitutional protection *and* that the government's deprivation of that protected interest occurred in a conscience-shocking manner." *Whittaker*, 674 F.Supp.2d at 699 (emphasis in original). The mere fact that an interest is entitled to *procedural* due process protection does not necessarily mean that it is also entitled to *substantive* due process protection.[33] *Gikas v. Washington School District*, 328 F.3d 731, 732-733 (3d Cir. 2003). "[T]he liberty to pursue a calling or occupation" has been recognized as an interest secured to individuals by the Fourteenth Amendment. *Thomas v. Independence Township*, 463 F.3d 285, 297 (3d Cir. 2006); *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1259 (3d Cir. 1994); *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992). The United States Court of Appeals for the Third Circuit has not clarified whether this interest is sufficiently "fundamental" to qualify for *substantive* due process protection. *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 138-143 (3d Cir. 2000). Nevertheless, the Court of Appeals has highlighted a distinction between "the liberty to pursue a calling or occupation" and "the right to a specific job" for the purpose of determining whether an individual has an interest that is worthy

---

[32] Hart raises the defense of qualified immunity without specifically addressing whether Burns alleges a violation of the Due Process Clause. Docket No. 21 at 11-20. Nevertheless, the inquiry as to whether Hart is entitled to qualified immunity in this case largely turns on whether the averments contained in the second amended complaint are sufficient to establish an actionable violation of the Fourteenth Amendment. *Pearson v. Callahan*, 555 U.S. 223, ___, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

[33] The "stigma-plus" test is not normally applied in the *substantive* due process context. *Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 502 (6th Cir. 2007). Therefore, the "liberty interest" that Burns must rely on to advance her substantive due process claim is of a different dimension than the reputation-based liberty interest relevant to her procedural due process claim.

of constitutional protection. *Piecknick*, 36 F.3d at 1259, 1262. This line of reasoning suggests that "the liberty to pursue a calling or occupation," unlike "the right to a specific job," is entitled to *substantive* due process protection.[34] *Wright v. Genesee County Corp.*, 659 F.Supp.2d 842, 849-850 (E.D.Mich. 2009).

The standard for determining when an executive officer violates an individual's substantive due process rights was articulated by the Supreme Court in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). In a substantive due process challenge to the actions of an executive officer, "the threshold question is whether the behavior of [that] officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847, n. 8. The conscience-shocking concept "duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848. "At one end of the spectrum is negligence, which is categorically insufficient to constitute conscience-shocking conduct." *Taylor v. Altoona Area School District*, 513 F.Supp.2d 540, 565 (W.D.Pa. 2007). At the other end of the spectrum is "conduct intended to injure in some way unjustifiable by any governmental interest," which is "the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. "Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Id.* (internal citation and quotation marks omitted). The level of culpability required for a state official's conduct to shock

---

[34] The Supreme Court has observed that a public employee "who can be discharged only for cause" has a constitutionally-protected property interest in his or her position and "cannot be fired without due process." *Gilbert v. Homar*, 520 U.S. 924, 928-929, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). Thus, it is beyond dispute that "the right to a specific job" is sometimes sufficient to invoke the *procedural* protections of the Due Process Clause.

the conscience increases as the time that he or she has to deliberate decreases. *Phillips*, 515 F.3d at 240. Where a state official enjoys the luxury of "having time to make unhurried judgments," his or her "deliberate indifference" to an individual's welfare may be conscience-shocking. *Lewis*, 523 U.S. at 853. The United States Court of Appeals for the Third Circuit has left open "the possibility that deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known." *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006). Where a state official is not in a "hyperpressurized environment" but nevertheless acts without "the luxury of proceeding in a deliberate fashion," his or her conduct is generally deemed to be conscience-shocking only if it reaches "a level of gross negligence or arbitrariness" that "exceed[s] both negligence and deliberate indifference." *Miller v. City of Philadelphia*, 174 F.3d 368, 375-376 (3d Cir. 1999). An official acts with this level of culpability when he or she "consciously disregards" a "great risk" that his or her conduct will result in harm to the aggrieved individual. *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002). Where a state official acts in a "hyperpressurized environment" requiring quick action, only "an intent to cause harm" will normally suffice to render his or her actions violative of the Due Process Clause. *Walter v. Pike County*, 544 F.3d 182, 192 (3d Cir. 2008).

As noted earlier, the listing of Burns' name in the central register clearly implicated her "legitimate interest in pursuing her chosen occupation." *Valmonte*, 18 F.3d at 1003. Although the causal relationship between this listing and Burns' inability to continue working at Helping Hands is not entirely clear, Burns alleges that Hart had access to internal DPW documentation specifying that an individual's classification as an "indicated" child abuser would render him or her unable to work as a licensed child-care provider. Docket No. 17 at ¶ 144. She avers that

Hart was himself aware of the "negative consequences" that would befall her if he were to improperly apply the "substantial evidence" standard. *Id.* at ¶¶ 145-147.

The second amended complaint, when read in the light most favorable to Burns, indicates that Hart had "the luxury of proceeding in a deliberate fashion." *Miller*, 174 F.3d at 375. There is no indication that Hart was forced to make a determination quickly. Hart notified Burns of the investigation on November 19, 2008. Docket No. 17 at ¶ 66. He determined that Burns was an "indicated" child abuser on December 16, 2008. *Id.* at ¶ 83. As far as the Court can tell, the only factor influencing the timing of Hart's actions was the CPSL's stated preference that investigators determine the veracity of child-abuse reports within 30 days. 23 PA. CONS. STAT. § 6368(c). Thus, the culpability standard applicable to this case would appear to be "deliberate indifference." *Kaucher v. County of Bucks*, 455 F.3d 418, 426 (3d Cir. 2006).

If the applicability of the "deliberate indifference" standard was the sole factor relevant to whether Burns properly alleges a violation of her substantive due process rights, the inquiry would proceed no further. Burns alleges that Hart was "aware of the consequences of his investigation."[35] Docket No. 17 at ¶ 146. The analysis in this case, however, must account for an additional factor. In *Lewis*, the Supreme Court was called upon to determine "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *Lewis*, 523 U.S. at 836. The Supreme Court answered that question in the negative, holding that "only a purpose to cause harm *unrelated to the legitimate object of arrest* will satisfy the element of arbitrary conduct shocking to the

---

[35] The United States Court of Appeals for the Third Circuit has not decided whether a showing of "deliberate indifference" always requires "subjective knowledge of a risk," or whether "the obviousness of a risk can be sufficient for liability." *Sanford v. Stiles*, 456 F.3d 298, 309, n. 13 (3d Cir. 2006). That question need not be confronted in this case, since Burns alleges that Hart was subjectively aware of what would happen to her if he were to classify her as an "indicated" child abuser. Docket No. 17 at ¶ 146.

conscience" under those circumstances. *Id.* (emphasis added). The holding in *Lewis* suggests that the substantive due process inquiry must account not only for the amount of time that a state official has to act, but also for the precise nature of the "harm" visited upon an aggrieved individual as a result of that official's conduct. The relevant "harm" in *Lewis* was the suspected offender's death, which was "unrelated to the legitimate object of arrest." *Id.*

The inquiry in this case must account not only for the "harm" suffered by Burns as a result of her wrongful designation as an "indicated" child abuser, but also for the DPW's interest in ensuring that children are protected from *actual* abusers. *Dupuy*, 397 F.3d at 505. In *Whittaker v. County of Lawrence*, 674 F.Supp.2d 668 (W.D.Pa. 2009), this Court explained:

> A singular focus on the mental state of a government official accused of violating the Due Process Clause presupposes that the official's actions were somehow unjustified. Such a presupposition is sometimes appropriate. A government never has a legitimate interest in subjecting a woman to rape, *United States v. Lanier*, 520 U.S. 259, 261-272, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), permitting a juvenile prison inmate to be physically assaulted by other inmates, *A.M. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 579-588 (3d Cir. 2004), or rendering an individual a quadriplegic, *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 64-67 (3d Cir. 2002). When the harm caused by a government official's conduct is unrelated to a legitimate interest within the purview of a sovereign's police power, arbitrariness can be presumed from a showing that the official acted with a specific intent or purpose to inflict such harm upon the aggrieved individual. *County of Sacramento v. Lewis*, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)(describing "conduct intended to injure in some way unjustifiable by any government interest" as "the sort of official action most likely to rise to the conscience-shocking level"). On the other hand, when the "harm" intentionally caused by a governmental action is purely incidental to an exercise of the State's police power, the challenged action can be characterized as "arbitrary" only if it is not rationally related to a legitimate state interest. *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 574 (6th Cir. 2008).

*Whittaker*, 674 F.Supp.2d at 700, n. 13. While Burns alleges that Hart was "grossly negligent in his application of the substantial evidence standard," she does not allege that the "purpose" of his investigation was somehow unrelated to the State's "legitimate object" of protecting children

53

from abuse.  Docket No. 17 at ¶ 149.  Indeed, she acknowledges that Hart's determination was based on a medical report describing DM's injury and statements provided to him by DM and her sister.  *Id.* at ¶ 90.  Hart's alleged failure to consider exculpatory evidence in making his determination constituted a violation of Burns' *procedural* due process rights.  *Valmonte*, 18 F.3d at 1004; *Dupuy*, 397 F.3d at 505-506.  Nevertheless, the existence of "some evidence" to support Hart's finding suggests that his actions were motivated by a genuine desire to ensure that children were not being mistreated.  *Chainey v. Street*, 523 F.3d 200, 220 (3d Cir. 2008)(explaining that, in some situations, even an allegation of an "improper motive" is insufficient to establish a substantive due process violation).  Because Hart's actions "were rationally related to a legitimate governmental interest, they were not 'arbitrary' in the constitutional sense."  *Whittaker*, 674 F.Supp.2d at 701, n. 14.  The second amended complaint alleges no violation of Burns' *substantive* due process rights.

If a substantive due process violation could be found solely on the basis of Hart's alleged "deliberate indifference" to the "negative consequences" that Burns was about to suffer, without reference to the State's competing interest in safeguarding the welfare of children, every erroneous finding of abuse made by an investigator would be actionable under the Fourteenth Amendment.  "[S]uch a reading [of the Due Process Clause] would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States."  *Paul*, 424 U.S. at 701.  Moreover, courts have "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).  The Supreme Court has described the "preponderance of the evidence" standard as a means of ensuring that parties to a

dispute will "share the risk of error in roughly equal fashion." *Addington*, 441 U.S. at 423.

There is an inherent "risk of error" *every time* that this evidentiary standard (or the closely

related "substantial evidence" standard) is applied. A state official's decision to act in the face of

such a "risk" does not suffice to make his or her behavior "so egregious, so outrageous, that it

may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847, n. 8.

### 3. Qualified Immunity

Since Burns properly alleges that Hart violated her procedural due process rights by

failing to consider evidence suggesting that she had not abused DM, the Court must determine

whether Hart is entitled to qualified immunity at this stage.[36] *Mitchell*, 472 U.S. at 526. It is of

no significance that Hart's conduct may have contravened certain provisions of the CPSL.

Docket No. 17 at ¶¶ 65, 71. An official sued under § 1983 for violating an individual's

*constitutional* rights does not forfeit his or her entitlement to qualified immunity by violating a

state statute. *Davis v. Scherer*, 468 U.S. 183, 193-197, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Having alleged a violation of her procedural due process rights, Burns can overcome Hart's

defense of qualified immunity "only by showing that *those rights* were clearly established at the

time of the conduct at issue." *Id.* at 197 (emphasis added). In this context, a right can be

"clearly established" even in the absence of precedents which bind this Court. *Williams v.

Bitner*, 455 F.3d 186, 192-193 (3d Cir. 2006)("[W]e routinely consider decisions by other Courts

of Appeals as part of our 'clearly established' analysis when we have not yet addressed the right

asserted by the plaintiff."); *Brown v. Muhlenberg Township*, 269 F.3d 205, 211, n. 4 (3d Cir.

---

[36] In *Ernst v. Child & Youth Services of Chester County*, 108 F.3d 486, 488-489 (3d Cir. 1997), the United States Court of Appeals for the Third Circuit held that child-welfare workers and attorneys who prosecute "dependency proceedings" on behalf of the State "are entitled to absolute immunity from suit for all of their actions in preparing for and prosecuting such dependency proceedings." Nevertheless, this entitlement to "absolute immunity" does not shield child-welfare workers from liability for their "investigative or administrative" actions. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186, 194-195 (3d Cir. 2009); *Ernst*, 108 F.3d at 497, n. 7. Hart is not entitled to absolute immunity under the circumstances of this case. *Achterhof v. Selvaggio*, 886 F.2d 826, 830-831 (6th Cir. 1989).

2001)("If the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising.").

Having carefully reviewed the state of the law at the time of Hart's alleged actions, the Court is convinced that a reasonable investigator in his position would have known that the Due Process Clause prohibited a determination that Burns was an "indicated" child abuser based *solely* on inculpatory evidence, and without reference to the available exculpatory evidence. The decisions in *Valmonte* and *Dupuy*, both of which preceded Hart's investigation, clearly explained that the Due Process Clause requires an investigator to "take into account *all* of the available evidence that tends to show that abuse or neglect did *or* did not occur" *before* classifying an accused individual as an "indicated" child abuser and listing his or her name in a "central register." *Dupuy*, 397 F.3d at 506 (emphasis in original); *Valmonte*, 18 F.3d at 1004 (explaining that child-abuse determinations are intolerably open to subjectivity "when the factfinder is not required to weigh evidence and judge competing versions of events"). The Pennsylvania Supreme Court has indicated that the uncorroborated testimony of a three-year-old child cannot alone satisfy the DPW's burden of proving that "substantial evidence" of abuse exists. *A.Y.*, 641 A.2d at 1152-1153. The Pennsylvania Supreme Court has also suggested that, in some instances, the CPSL's "substantial evidence" standard may not require a sufficient quantum of evidence to satisfy the Due Process Clause.[37] *J.S. v. Department of Public Welfare*, 596 A.2d 1114, 1116, n. 2 (Pa. 1991). The Commonwealth Court has intimated that even if the Fourteenth Amendment does not require more than "substantive evidence" of abuse before an accused individual can be

---

[37] The Court expresses no opinion as to whether the "substantial evidence" standard is sufficient to satisfy the Constitution under the present circumstances. Since Burns alleges that Hart's determination was not based on "substantial evidence" in any event, she alleges a violation of the Due Process Clause even if it is assumed that the Fourteenth Amendment does not require *more than* "substantial evidence" of abuse before an accused individual's name can be added to the central register. Docket No. 17 at ¶¶ 147-155.

classified as an "indicated" child abuser, anything *less* than "substantial evidence" would render a finding of abuse unconstitutional. *K.J. v. Department of Public Welfare*, 767 A.2d 609, 611-612 (Pa.Commw.Ct. 2001). In light of the views expressed by two federal appellate courts and two Pennsylvania appellate courts *before* Hart commenced the investigation at issue in this case, a reasonable person in Hart's position would have known that the Fourteenth Amendment required him to consider exculpatory evidence *before* determining that Burns was guilty of child abuse. Since Burns alleges that such exculpatory evidence was ignored during the course of Hart's investigation, her averments are sufficient to overcome his defense of qualified immunity at this stage.

Burns may proceed with her claim that Hart violated her procedural due process rights. Hart remains free to raise the defense of qualified immunity at a later stage if the evidence obtained during the course of discovery does not support the allegations contained in the second amended complaint. *Behrens v. Pelletier*, 516 U.S. 299, 306-307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). Burns' *substantive* due process claim will be dismissed, since the second amended complaint properly alleges only a violation of her *procedural* due process rights.

**V.    <u>Conclusion</u>**

For the foregoing reasons, the Defendants' motion to dismiss will be granted with respect to Burns' official-capacity claims against the Secretary and her substantive due process claim against Hart. The motion will be denied with respect to Burns' procedural due process claim against Hart. Since Burns lacks standing to seek prospective relief, the Secretary will be dismissed as a party to this case. Burns remains free to demonstrate that she was deprived of concrete property interests in addition to the reputation-based liberty interest discussed earlier.

Hart remains free to assert his entitlement to qualified immunity at a later stage in this litigation.

An appropriate order follows.

BY THE COURT:


*s/ Nora Barry Fisher*
Nora Barry Fischer
United States District Judge

Date:   March 4, 2011
cc:     All counsel of record